**Terry Don WOODWARD, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–03–00386–CR.**

Court of Appeals of Texas, Waco.

July 6, 2005.

Rehearing Overruled Sept. 6, 2005.

Stan Schwieger, Waco, for appellant.

John W. Segrest, McLennan County Dist. Atty., Waco, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

TOM GRAY, Chief Justice.

Terry Don Woodward, Jr. was convicted of murder and of aggravated assault with a deadly weapon and sentenced to life in prison. Because the trial court properly refused Woodward's request for a lesser-included offense instruction, properly admitted evidence of Woodward's "White Pride" tattoo during punishment, and properly allowed expert testimony regarding the distance from which one of the victims was shot, we affirm.

### LESSER INCLUDED OFFENSE

■ Woodward first contends that the trial court erred in refusing to instruct the jury on the lesser-included offense of criminally negligent homicide. Woodward was charged with the murder of Roderick Brownlow, Jr. The court also gave the jury an instruction on manslaughter. Woodward, however, wanted an instruction on criminally negligent homicide, as well.

■ Woodward and the State agree that criminally negligent homicide is a lesser included offense of murder. *See Thomas v. State*, 699 S.W.2d 845, 847 (Tex.Crim. App.1985). Thus the issue left for us to decide is whether there is some evidence in the record that would permit a jury to rationally find that if a defendant is guilty, he is guilty only of the lesser offense. *See*

*Rousseau v. State*, 855 S.W.2d 666, 673 (Tex.Crim.App.1993).

■ Woodward contends he is entitled to the instruction because he testified that all he intended to do was to "scare them off," not to kill anyone. The key to criminal negligence is the failure of the actor to perceive the risk created by his conduct. *Still v. State*, 709 S.W.2d 658, 660 (Tex. Crim.App.1986); *Wong v. State*, 745 S.W.2d 563, 565 (Tex.App.-Waco 1988, no pet.). Simply because Woodward did not intend the result does not automatically entitle him to a charge on criminal negligence. *See Wong*, 745 S.W.2d at 565. There is no evidence in the record to show that Woodward failed to perceive the risk of shooting the gun. Thus, the trial court did not err in failing to give an instruction on criminally negligent homicide. Woodward's first issue is overruled.

### TATTOO

Woodward next contends that the trial court erred in allowing testimony regarding his "White Pride" tattoo during punishment because 1) the State failed to provide notice of its intent to introduce evidence of the tattoo pursuant to article 37.07, § 3(g) of the Code of Criminal Procedure, 2) evidence of the tattoo was irrelevant, and 3) evidence of the tattoo was inadmissible pursuant to Rule 403.

■ Woodward admits that the State's duty to provide notice of its intent to introduce evidence of the tattoo is triggered by a request from the defendant to the State and that, rather than a request to the State, he filed a motion with the trial court to secure the State's compliance. The trial court did not rule on the motion. When a document seeks trial court action, it cannot also serve as a request for notice triggering the State's duty under Article 37.07, § 3(g)—to hold otherwise would encourage

gamesmanship. *Mitchell v. State*, 982 S.W.2d 425, 427 (Tex.Crim.App.1998).

But Woodward argues 1) that because the State provided notice of some extraneous offenses or bad acts without a proper request, it was obligated to provide reasonable notice as to all bad acts it would use, and 2) that the State should have objected to Woodward's failure to have a hearing on his motion for notice. Woodward bases this argument on the principles of error preservation and judicial estoppel. His argument is not persuasive. The Code clearly places the burden of triggering the State's duty to provide notice on the defendant. "The requirement under this subsection that the attorney representing the state give notice *applies only if* the defendant makes a timely request to the attorney representing the state for the notice." TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(g) (Vernon Pamp.2004–05) (emphasis added). A motion to the trial court does not satisfy this burden. *Mitchell*, 982 S.W.2d at 427. We refuse to "encourage gamesmanship" and shift the burden to the State to make sure the defendant either provides notice to the State or sets his motion for a hearing, or to penalize the State for giving some notice when it was not required to give any notice.

▬▬▬ Woodward also contends that the evidence of the tattoo is irrelevant and, even if relevant, its probative value is substantially outweighed by the danger of unfair prejudice. At the punishment phase of a criminal trial, evidence may be presented as to any matter that the court deems relevant to sentencing, including evidence of the defendant's background or character. *See* TEX.CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon Pamp.2004–05). Determining what is relevant is a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case. *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim.App.1999). A defendant's choice of tattoos, like his personal drawings, can reflect his character and/or demonstrate a motive for his crime. *Conner v. State*, 67 S.W.3d 192, 201 (Tex.Crim.App.2001).

Woodward does not specifically set out why the tattoo is irrelevant. It appears that, by relying on a United States Supreme Court decision[1], he contends the tattoo reflects only his "abstract beliefs" and evidence thereof is inadmissible. However, in *Dawson*, the Supreme Court reiterated that the Constitution does not erect a per se barrier to the admission of evidence concerning a defendant's beliefs or associations at sentencing because those beliefs or associations are protected by the First Amendment. *Dawson*, 503 U.S. at 165, 112 S.Ct. 1093. The problem in *Dawson* was that the stipulation about the Aryan Brotherhood was so narrow, it was no longer relevant. There was nothing to link the group to the crime. That is not the case here. Woodward is white and the victim was black. At least one witness testified that Woodward yelled, "I will kill you niggers!" as he shot toward his victim and others. Woodward, on the other hand, testified that he shot in the air and had no intent to kill anyone. Thus, Woodward's tattoo, "White Pride," was relevant to his character and thus relevant to his punishment.

▬▬▬ Next, we must decide whether the probative value of the tattoo evidence was "substantially outweighed by the danger of unfair prejudice." *See* TEX.R. EVID. 403. *Unfair prejudice* does not, of course, mean that the evidence injures the opponent's case; rather it refers to an undue tendency to suggest decision on an improp-

---

1. *Dawson v. Delaware,* 503 U.S. 159, 112    S.Ct. 1093, 117 L.Ed.2d 309 (1992).

er basis, commonly, though not necessarily, an emotional one. *Rogers v. State*, 991 S.W.2d 263, 266 (Tex.Crim.App.1999). When the record demonstrates one or more relevant criteria reasonably creating a risk that the probative value of the tendered evidence is substantially outweighed by the danger of unfair prejudice, then we should conclude that the trial court abused its discretion in admitting the evidence. *Reese v. State*, 33 S.W.3d 238, 241 (Tex. Crim.App.2000); *Graff v. State*, 65 S.W.3d 730, 740 (Tex.App.-Waco 2001, pet. ref'd).

Woodward contested the issue that the shootings were racially motivated. He called two witnesses who stated Woodward was not a racist. The State did not have other convincing evidence that the shootings were racially motivated. Only one out of five witnesses testified that Woodward said anything racial prior to the shootings. The probative value of the tattoo was compelling in that Woodward claimed he had no intent to kill anyone and was acting under the immediate influence of sudden passion. Woodward did not ask for a limiting instruction regarding the jury's consideration of his tattoo. A general limiting instruction regarding any extraneous offenses was included within the charge to the jury, but no specific instruction as to the tattoo was included. However, based on the record before us, we cannot say that a limiting instruction would not have been effective.

Having none of the relevant criteria present, the trial court did not abuse its discretion in allowing testimony of the tattoo over Woodward's Rule 403 objection.

Woodward's second issue is overruled.

**2.** At trial, Woodward also objected that the technique was not properly applied because there was no testing of the weapon or the

## EXPERT TESTIMONY

■ In his last issue, Woodward contends that the trial court erred in admitting evidence of the results of a gunshot/distance test. Specifically, he argues that the state failed to demonstrate that evidence of gunshot residue analysis distance determination is reliable because the discipline is not a valid scientific theory.[2] *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App.1992).

The State had the burden of proving the reliability of the evidence by clear and convincing evidence. *Id.* This Court now decides whether the trial court abused its discretion in admitting the evidence. *Id.* at 574.

*Kelly* lays out a "common sense" test based upon an analysis of three criteria to determine if expert testimony is reliable. *Holmes v. State*, 135 S.W.3d 178, 180 (Tex. App.-Waco 2004, no pet.). The case then discusses seven factors that could affect a trial court's reliability determination. Although there is no precise correlation between the factors and criteria, factors 1, 3, and 6 generally correlate with the criteria challenged by Woodward-that gunshot residue analysis distance determination is not a valid scientific theory. *See id.* at 181.

David Spence, the supervisor of the Trace Evidence section at the Southwestern Institute of Forensic Science in Dallas, testified at a hearing outside the presence of the jury.

### Accepted by the scientific community

Spence testified that two chemical tests are performed for the gunshot residue analysis distance determination. One is a sodium test for specific lead residue. The other is the modified Grice test where clothing is examined for nitrite residue

ammunition. He does not argue this basis on appeal.

that results from the burning, partial burning, or degradation of gunpowder. Spence testified that these two tests identify residues that originate from gunshot residue, namely lead and nitrite residue, which are then applied to a distance determination. Patterns of the residue are developed and an examination of the clothing, microscopically and with the naked eye, is performed to look for visible gunpowder particles.

Spence further testified that test shots, using the crime weapon and ammunition or the same type of ammunition, are fired at cotton test targets. The same chemical tests and microscopic exams are performed. A comparison of the test shot patterns and the actual crime scene patterns is made. Based on the comparison, Spence stated, the distance of the actual gunshot can be determined.

Spence affirmed that the discipline of gunshot residue analysis distance determination is recognized in both the scientific and law enforcement communities. The Texas Department of Public Safety and the FBI use these same tests and techniques. He also testified that the discipline is performed nationwide and by other countries, as well.

*Existence of Literature*

Spence testified that he had read "many, many different published books and literature" on gunshot residue distance determination. One such book was *Gunshot Wounds* by Dr. Vincent J. DeMayo. Spence described the book as an authoritative textbook on the examination of bullet wounds and gunshot residue analysis. He had also read the majority of articles on gunshot residue distance determination published in the Journal of Forensic Sciences. Spence brought with him three articles on the subject published in the "AFTE" Journal.

*Clear Explanation*

Spence clearly explained the process and analysis in making a determination of how far away a gunshot was fired based on residue tests and comparison tests. Woodward admits on appeal that the testing described was "straightforward and intelligible."

Spence presented much more information regarding his qualifications, the validity of the techniques used in gunshot residue analysis distance determination and his application of those techniques. However, Woodward does not contend on appeal that the State failed to prove those criteria.

In reviewing this record, the State demonstrated by clear and convincing evidence that the underlying scientific theory of the gunshot residue analysis distance determination was valid. Thus, the trial court did not abuse its discretion in admitting the testimony.

Woodward's third issue is overruled.

**CONCLUSION**

Having overruled each issue for review, the trial court's judgment is affirmed.

Justice VANCE dissenting with note.*

---

* "(Justice Vance dissents with a note: This opinion does not adequately address the issue regarding a lesser included offense. Woodward cites *Esparza v. State*, 520 S.W.2d 891 (Tex.Crim.App.1975). The State cites *Schroeder v. State*, 123 S.W.3d 398 (Tex.Crim.App. 2003). This opinion cites neither. Woodward testified that his intent was to "scare them off" and that, being more than a scintilla of evidence, was sufficient to entitle him to

the lesser charge. *Bignall v. State*, 887
S.W.2d 21 (Tex.Crim.App.1994) (The policy of

the Court is to liberally permit the instruction
when warranted.))"